**MAKRO CAPITAL OF AMERICA, INC., Plaintiff,**

v.

**UBS AG and United States of America, Defendants.**

**No. 04–21917–CIV.**

United States District Court, S.D. Florida, Miami Division.

May 18, 2005.

---

———

Gregory J. Trask and Peter W. Homer, Homer Bonner, P.A., Miami, Florida, and James Weidner, Thomas Teige Carroll and Amber Wessels, Clifford Chance U.S. LLP, New York, New York, for defendant UBS AG.

Steve I. Silverman, Abbey L. Kaplan and D. Fernando Bobadilla, Kluger, Peretz, Kaplan & Berlin, Miami, Florida, for plaintiff Makro Capital of America, Inc.

## ORDER DISMISSING COMPLAINT WITHOUT PREJUDICE

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on Defendant, UBS AG's ("UBS['s]") Motion to Dismiss, filed on February 17, 2005 [D.E. 32]. Earlier, on July 29, 2004, Plaintiff, Makro Capital of America, Inc. ("Makro") filed a civil action against UBS and the United States of America, seeking to recover the proceeds of assets that were the subject of a 1963 settlement between the United States and UBS's predecessor. On April 11, 2005, upon Makro's stipulation, the Court dismissed all claims against the United States [D.E. 53]. The remaining defendant, UBS, moves to dismiss, arguing, among other things, that the Trading with the Enemy Act of 1917 prohibits the remedy that Makro seeks, and that Makro lacks standing to assert claims on behalf of others.

## I. BACKGROUND

The Complaint contains the following allegations, which for present purposes, the Court accepts as true. Makro is a Florida corporation and shareholder of I.G. Farbenindustrie AG ("Farben"), a "notorious German company," which, as a result of the Nuremberg trials, was liquidated because of its direct involvement with the Nazi regime during World War II. (Compl. [D.E. 1] ¶ 14, 23–24.) According to the Complaint, a trustee has been appointed to dispose of Farben's assets after payment of its debts, which include payment of reparations to Holocaust victims. (*Id.* ¶ 27.) Makro states that it has "legal, contractual, and cognizable rights" to make claims on behalf of itself, Farben, Farben's trustees, and other Farben shareholders. (*Id.* ¶ 26.)

In 1929, Farben formed a Swiss company, I.G. Chemie, which, according to Makro, Farben continuously managed and controlled. (*Id.* ¶¶ 1–2.) In the 1930s, I.G. Chemie acquired majority holdings in several U.S. companies, which merged in 1939 into General Aniline & Film Corporation ("GAF"). (*Id.* ¶ 3.) Between February 1942 and February 1943, the United States government seized ownership of GAF, a Delaware corporation, pursuant to the Trading with the Enemy Act, 50 U.S.C. app. § 5(b). *See* Vesting Order No.1, 4 Fed.Reg. 1046 (Feb. 16, 1942); Vesting Order No. 155, 7 Fed.Reg. 7764 (Sept. 19, 1942); Vesting Order No. 907, 8 Fed.Reg. 2453 (Feb. 15, 1943).

The government concluded that GAF was "owned by or held for the benefit of" Farben, a "national of a designated enemy country (Germany)." Vesting Order No. 907, 8 Fed.Reg. at 2453. Accordingly, pursuant to § 5(b) of the Trading with the Enemy Act, the U.S. "vested" ownership of GAF's outstanding stock in the Secretary of the Treasury (and later the Alien Property Custodian). *See* 50 U.S.C. app. § 5(b)(1)(B) ("During the time of war, the President may ... void, prevent or prohibit ... any right, power, or privilege with respect to ... any property in which any

foreign country or a national thereof has any interest ... and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President ....").

In 1945, I.G. Chemie changed its name to Internationale Industrieund Handelsbeteiligungen AG ("Interhandel"). (Compl.¶ 8.) In 1948, Interhandel brought suit under § 9(a) of the Trading with the Enemy Act, 50 U.S.C. app. § 9(a), to recover ownership of GAF. *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 199, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). Interhandel claimed that it—rather than Farben—owned GAF's outstanding shares when the government seized them, and as a national of a neutral power (Switzerland), Interhandel claimed that it was entitled to recovery. *Id.*

The United States, however, challenged Interhandel's claim of ownership and argued that in any event Interhandel was an "enemy" under the Trading with the Enemy Act because it was intimately connected with Farben and "and hence was affected with 'enemy taint' despite its 'neutral' incorporation." *Id.* Farben's liquidators sought unsuccessfully to intervene in the litigation. *See Soclete Internationale*, No. 4360–48 (D.D.C. Dec. 19, 1958) (order denying motion for leave to intervene).

On December 20, 1963, the U.S. government entered into a settlement agreement with Interhandel. *See Societe Internationale*, No. 4360–48 (D.D.C. Dec. 20, 1963) (stipulation of settlement). The settlement provided that the GAF shares seized by the government would be auctioned and the proceeds would be split between the United States and Interhandel. *Id.* at 11–14. According to Makro, Interhandel received 40% to 45% of the GAF sale proceeds in 1966, worth approximately $122 million, and the U.S. government retained the remainder.[1] (Compl.¶¶ 12, 21.)

In 1967, Interhandel merged into what is today known as UBS, a Swiss bank with headquarters in Zurich and New York. (*Id.* ¶¶ 21, 28.) In 1983, Farben's liquidators sued UBS's predecessor, Schweizerische Bankgesellschaft ("SBG"), in Germany, seeking to recover the GAF sale proceeds. *See I.G. Farbenindustrie AG in Abwicklung v. Schweizerische Bankgesellschaft*, No. 9 U 80/84, slip op. at 7 (Higher Reg'l Ct. Frankfurt Mar. 23, 1988). Farben argued that it controlled Interhandel and was owed a fiduciary duty by Interhandel, even after the parties ended their "common interests agreement" in 1940. *Id.* at 7–9. Consequently, Farben argued, it was owed the proceeds of the GAF sale. *Id.*

The Higher Regional Court in Frankfurt disagreed. *Id.* at 58. The court affirmed a lower court's dismissal of Farben's action, finding that "there is no legally valid fiduciary agreement between the parties, in addition to which any such agreement that were to exist would be subject to Swiss law and would be statute-barred ...." *Id.* The German Federal Supreme Court denied certiorari on December 20, 1988. *I.G. Furbenindustrie AG in Abwicklung v. Schweizerische Bankgesellschaft*, No. XI ZR 84/88 (Fed. S.Ct. Germany Dec. 20, 1988).

During the 1990s, victims of Nazi persecution commenced class-action litigation against industrial and financial firms, resulting in two historic settlements. In July 2000, the German Parliament passed

---

**1.** Makro alleges that the present day value of the $122 million that Interhandel received in 1966 is $1.8 billion. (Compl.¶ 21.)

a law creating the Foundation "Remembrance, Responsibility and the Future," funded with approximately $5 billion, to make payments to individual Nazi-era victims for claims against German industries. *See Frumkin v. JA Jones, Inc. (In re Nazi Era Cases Against German Defendants Litig.)*, 129 F.Supp.2d 370, 372, 379 (D.N.J. 2001) (dismissing claim by forced labor victim, based on political question doctrine and international comity, following creation of the Foundation). Also in July 2000, the United States District Court for the Eastern District of New York granted final approval of a $1.25 billion settlement against Swiss banking, governmental, and business entities brought by Holocaust victims. *In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 167 (E.D.N.Y. 2000).

In 2004, German shareholders of Farben and a German court-appointed trustee of Farben commenced action in the Eastern District of New York against UBS and the United States government, seeking to recover the proceeds of the GAF shares that were returned to Interhandel pursuant to the 1963 settlement. *Arndt v. UBS AG*, 342 F.Supp.2d 132, 134 (E.D.N.Y.2004). The plaintiffs there claimed that UBS wrongfully withheld assets that could be traced directly to Farben and concealed evidence of Interhandel's connection to Farben. *Id.* at 135–36.

On November 1, 2004, the District Court in New York granted the trustee's motion for voluntary dismissal under Federal Rule of Civil Procedure 41(a)(1)(i) and dismissed the shareholders' claims due to lack of subject matter jurisdiction under the Alien Tort Claims Act or the Torture Victims Protection Act, 28 U.S.C. § 1350. *Id.* at 143. Although UBS had also moved pursuant to the All–Writs Act, 28 U.S.C. § 1651(a), for an injunction barring Makro from proceeding with its case (which UBS

argued was an identical claim) in this Court, the New York District Court denied the motion because it lacked subject matter jurisdiction over the case. *Id.* at 142.

On July 29, 2004, Makro commenced this action, seeking, once again, to recover the proceeds of the GAF sale which Interhandel received in 1966. Makro alleges five causes of action in diversity against UBS: for an accounting, imposition of constructive trust, fraud, misrepresentation, and spoliation of evidence. Makro claims that newly discovered evidence shows that I.G. Chemie was a "shell, cloaked or alterego company" of Farben and that UBS or its predecessors concealed evidence to interfere with the return of Farben's assets. (Compl.¶ 17–18.) Makro claims that this newly discovered evidence proves that I.G. Chemie's assets (specifically, the GAF shares) belonged to Farben and must be returned so that they can be used to pay its debts, including reparations to Holocaust victims. (*Id.* ¶ 20.)

In its Motion to Dismiss, UBS argues that 1) § 39 of the Trading with the Enemy Act and the political question doctrine preclude Makro's claims; 2) principles of international comity require dismissal; 3) Makro lacks constitutional standing and individual capacity to assert its claims; and 4) claims on behalf of forced labor victims are barred by the Swiss World War II class-action settlement and the German Foundation agreement.

## II. LEGAL STANDARD

"Dismissal is appropriate where it is clear the plaintiff can prove no set of facts in support of the claims in the complaint. Accordingly, the court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall County Bd. of*

*Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir.1993) (citations omitted).

"In ruling on the motion to dismiss the district court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America*, 795 F.2d 948, 954 (11th Cir.1986). "When the allegations contained in a complaint are wholly conclusory, however, and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim." *Davidson v. Georgia*, 622 F.2d 895, 897 (5th Cir.1980).

Generally, "the Court is constrained to review the allegations as contained within the four corners of the complaint and may not consider matters outside the pleading without converting the defendant's motion into one for summary judgment." *Crowell v. Morgan Stanley Dean Witter Services, Co.*, 87 F.Supp.2d 1287, 1290 (S.D.Fla. 2000). However, "[t]he Eleventh Circuit has held that, when considering a 12(b)(6) motion to dismiss, a court may take judicial notice of the public record, without converting the motion to one for summary judgment, because such documents are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Davis v. Williams Communications., Inc.*, 258 F.Supp.2d 1348, 1352 (N.D.Ga.2003) (citing *Bryant v. Avado Brands Inc.*, 187 F.3d 1271, 1279–80 (11th Cir.1999); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.2001)).

## III. ANALYSIS

Acting under an alleged contractual right to bring claims on behalf of Farben, Makro seeks the return of assets which, it asserts, always belonged to Farben. Makro bases its claim on newly discovered documents, which allegedly prove that Farben controlled I.G. Chemie at the time the U.S. government seized GAF's outstanding stock from I.G. Chemie in 1942 and 1943. Therefore, Makro argues, UBS must return the proceeds from the sale of the GAF shares, which UBS's predecessor, Interhandel, received in 1966.

Even if everything Makro alleges is true, the result it seeks—return of the GAF sale proceeds to Farben—is not a legally obtainable remedy. Section 39(a) of the Trading with the Enemy Act provides, in pertinent part, that:

> [n]o property or interest therein of Germany, Japan, or any national of either such country vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act, shall be returned to former owners thereof or their successors in interest, and the United States shall not pay compensation for any such property or interest therein.

50 U.S.C. app. § 39(a). Accordingly, neither Farben, a national of Germany, nor its alleged successor in interest, Makro, may recover the proceeds from the sale of the GAF shares, the ownership of which was vested in the United States pursuant to the Trading with the Enemy Act in 1942 and 1943.[2]

---

**2.** Makro argues that ownership of the GAF shares *themselves* was vested in the United States—not the *proceeds* from the sale of those shares. Therefore, Makro argues, the proceeds are not "vested" property for purposes of the Trading with the Enemy Act. This argument lacks merit. The Trading with the

Enemy Act allows vested property to "be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States ...." 50 U.S.C. app. § 5(b)(1)(B). Makro cites to no authority supporting its argument that once vested property is auctioned by the government, the

In light of the statutory proscription, Makro argues that it "does not seek for itself a return of any property confiscated by the government ... [or] any of the settlement proceeds paid to Interhandel. Instead, Plaintiff asserts that the settlement proceeds that Interhandel received from the Government must be distributed to the victims, heirs and survivors of Nazi atrocities." (Pl.'s Opp. [D.E. 46] at 5–6.) On this issue, the Supreme Court has held, however, that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

In this case, the Complaint contains no allegation that any individual Holocaust victim has transferred a chose in action to Makro or that Makro otherwise has legal rights to bring actions on behalf of Holocaust victims or their survivors. Rather, Makro has alleged that it has "legal, contractual, and cognizable rights" to make claims on behalf of itself, Farben, Farben's trustees, and other Farben shareholders. These claims, as discussed above, are barred from recovery under § 39 of the Trading with the Enemy Act.

Finally, the fact that Makro seeks to prove with its newly discovered evidence— that I.G. Chemie was not an independent Swiss company after 1940 but rather an alter ego of Farben, a Nazi collaborator— is essentially the same conclusion that the U.S. government reached in 1942 and 1943 when it seized I.G. Chemie's assets. It is also the same issue that Interhandel and the U.S. government litigated for almost 20 years between 1948 and 1966. Farben was denied leave to intervene in that litigation in 1958, and Makro alleges no facts now demonstrating that it has a right, on behalf of Farben or Farben's shareholders

proceeds somehow become "unvested" prop-

or trustees, to disrupt the settlement reached by the United States and Interhandel in 1963.

At oral argument, Makro requested leave to amend to bring its claim as a *qui tam* action on behalf of the government, arguing, in essence, that Interhandel fraudulently procured the 1963 settlement. The Court will grant Makro's request to file an amended complaint in an effort to state a viable claim. Accordingly, it is

**ORDERED AND ADJUDGED** that UBS's Motion to Dismiss [D.E. 32] is **GRANTED**. The Complaint is **DIS-MISSED WITHOUT PREJUDICE.** Makro shall have until June 20, 2005 to file an amended complaint. Failure to file an amended complaint by the above deadline (or any extension thereof) will result in dismissal with prejudice.